**IN THE UNITED STATES DISTRICT COURT**
**FOR THE MIDDLE DISTRICT OF GEORGIA**
**MACON DIVISION**

**APPEN MEDIA GROUP,**

*Plaintiff*,

**v.**

**TYRONE OLIVER,** Commissioner of the Georgia Department of Corrections, **JACOB BEASLEY,** Warden of the Georgia Diagnostic and Classifications State Prison**, and CHRISTOPHER M. CARR,** Attorney General of the State of Georgia**,**

*Defendants***.**

**CIVIL ACTION NO.**
**5:26-cv-00385-TES**

**ORDER GRANTING PLAINTIFF'S MOTION FOR A TEMPORARY RESTRAINING ORDER IN PART**

The Georgia Diagnostic and Classifications State Prison ("GDCP") in Butts County houses Georgia's death-row inmates. *See* [Doc. 1, ¶ 22]. Plaintiff Appen Media Group claims that, at present, the Commissioner of the Georgia Department of Corrections, Tyrone Oliver; the Warden of GDCP, Jacob Beasley; and the Attorney General of the State of Georgia, Christopher Carr (collectively "Defendants") illegally restrict media access to and impede both the visual and auditorial aspects of what media outlets can observe during key components of perhaps the greatest exercise of governmental power: the execution of one of its citizens. [*Id.* at ¶¶ 2, 4–5, 10, 24–25, 40–

41]. Specifically, Appen says that the media should be able to observe and report certain pre-execution procedures, the "day of" preparation, and the actual administration of the lethal dose of compounded pentobarbital. [Doc. 1-2, pp. 4–9].

Appen submits that apart from O.C.G.A. § 17-10-41—mandating who "*shall* be present at the execution of a convicted person"—nothing stops Defendants from censoring executions to the level of "banning media presence altogether."[1] O.C.G.A. § 17-10-41 (emphasis added); [Doc. 1, ¶¶ 28, 31, 37]; [Doc. 1-2, p. 2]. Along with its complaint filed on September 2, 2026, Appen filed an emergency motion for a temporary restraining order ("TRO") challenging the state's executions "[w]ithout any limitations" for shielding its actions from the public. [Doc. 1, ¶¶ 2, 5, 10]; [Doc. 2]. To properly understand the nuances of Appen's arguments, the Court begins with Georgia's current framework for media access to lethal injections.

At the execution of a condemned individual, Georgia law requires "the superintendent of the state correctional institution or a deputy superintendent thereof, at least three executioners, two physicians to determine when death supervenes, and other correctional officers, assistants, technicians, and *witnesses as determined by the commissioner of corrections*" to be present. O.C.G.A. § 17-10-41 (emphasis added).

[1] Despite such a wide-sweeping position, Appen also argues that Defendants "[i]mplicitly conced[e]" that the State of Georgia "must allow at least some amount of [media] access to, and newsgathering and reporting about, state executions[.]" [Doc. 1, ¶ 32]. The record contains nothing that would indicate that Georgia has ever banned all media from an execution.

Noticeably absent from § 17-10-41's list of who "shall be present" at an execution—at least from Appen's standpoint—is any specific mention of media witnesses. [Doc. 1, ¶ 27]. Notwithstanding that omission, Appen alleges that Defendants "have devised a structure that designates media [witnesses] to observe and gather information about parts of the proceedings and then disseminate that information to the wider press, [and] in turn, to the public." [*Id.* at ¶ 32].

Part of that "structure"[2] is the Georgia Department of Corrections' ("GDC") lethal injection protocols, which were most recently issued in July of 2012. *See generally* [Doc. 1-2]. The protocols contain two sections, and for the purpose of securing preliminary injunctive relief, Appen tells the Court that it's "primarily concerned" with the second section detailing the steps that must be taken on the "Day of Execution." [Doc. 1, ¶¶ 39–40]; *see, e.g.*, [Doc. 1-2, pp. 3, 5–9]. This section doesn't directly deal with the media, but it does relate to what the media may witness (or not witness, according to Appen). Starting "[w]ithin [t]hree [h]ours of [e]xecution," the second section of the protocols details communication checks; preparation of necessary medical equipment, including delivery of the lethal injection chemicals to the designated room behind the execution chamber; inspection of the execution chamber and witness room, and ends with "[p]reparation of the [c]ondemned," the execution process itself, and post-execution procedures just before "[i]nternment of [the] [c]ondemned." [Doc. 1, ¶¶ 36,

[2] Throughout the brief history of this case, Appen consistently refers to it as a "scheme."

40–41]; [Doc. 1-2, pp. 5–9].

The protocols also lay out the rules regarding witnesses to the execution. Mindful of the discretion afforded to the Commissioner from § 17-10-41, the protocols echo the statute's "as determined by the commissioner" language. [Doc. 1, ¶ 28]. Like § 17-10-41, the protocols provide that witnesses for an execution are "designated and approved by the Commissioner," and "[t]he presence of witnesses requested by the condemned and those approved by the Commissioner, including media representatives, will be confirmed." [Doc. 1, ¶ 28 (citing [Doc. 1-2, pp. 6–7])].

Relying once more on the Commissioner's authority found in § 17-10-41, the protocols also contain the Commissioner's media relations policy, or "structure," to designate media witnesses for lethal injections. [Doc. 9-1]. Under this policy, the Associated Press ("AP") designates one reporter, the Georgia Press Association ("GPA") designates two reporters, and the Georgia Association of Broadcasters ("GAB") designates two reporters who "may witness the execution."[3] [Doc. 9-1, ¶ 1]. That's five media witnesses in total. Appen is a member of the GPA. [Doc. 1, ¶ 13]. Importantly for

[3] All three organizations may designate reporters from any news agency if they cannot find reporters from their own organizations who wish to attend the execution. [Doc. 9-1, ¶ 2]. Furthermore, any press members not permitted to directly observe part of the execution proceedings must set up at a staging area near the entrance to the prison's property and wait to receive information from the designated media witnesses. [Doc. 1, ¶ 34]. The approved media witnesses are required to share information with those gathered in this staging area. [*Id.* at ¶ 34]. Importantly, an unwillingness to share information is not, according to Appen, a concern as "media [witnesses who] have directly observed parts of Georgia's execution proceedings have consistently and willingly provided information about what they observed to other media outlets and to the general public." [*Id.* at ¶ 35].

Appen's claims, "[t]he Commissioner may decline to allow a media witness to attend an execution or serve as the media monitor"—a very specific role, different from the other media witnesses—"in his or her sole discretion *for any reason*." [Doc. 9-1, ¶ 3 (emphasis added)]. Seizing on the emphasized language, Appen alleges, "[o]utside of . . . § 17-10-41 and the [p]rotocols, there appear to be no operative statutes, regulations, rules, or procedures governing Defendants' decisions regarding media presence at executions." [Doc. 1, ¶ 30].

One of the reporters designated by the GPA must be a reporter from the county of the jurisdiction in which the condemned inmate was convicted, "if that publication wishes to send a representative." [Doc. 9-1, ¶ 1]. That reporter becomes the media monitor. [*Id.* at ¶ 2]. Only the media monitor may "observe the preparation of the condemned" from the witness room through a glass window but with no audio access.[4] [Doc. 1, ¶¶ 33, 47–49]; [Doc. 1-2, p. 7]. The other four media witnesses must wait outside during this time. *See* [Doc. 1-2, p. 7]. "Once intravenous access is established," the other media witnesses are escorted into the witness room. [Doc. 1, ¶ 58]; [Doc. 1-2, p. 7]. The Warden then introduces himself and offers an opportunity for a final statement and brief prayer. [Doc. 1, ¶ 58]; [Doc. 1-2, p. 7]. The execution then proceeds.

---

[4] From Appen's position, the problem posed by this "arbitrar[y]" limitation is that the media monitor is frequently someone inexperienced in observing and reporting on executions—more specifically, on "the crucial and often fraught step of establishing an intravenous line." [Doc. 1, ¶ 53]. Appen, however, has never been selected to observe an execution as a media witness.

So, to summarize Georgia's policies regarding media access to executions, the Commissioner has discretion over who witnesses an execution under Georgia law and current GDC procedures. Essentially, with respect to the media, the Commissioner's media relations policy gives him veto power over the five media witnesses that private media companies designate. *See generally* [Doc. 9-1]. Although not written into any procedure or policy on the record, Appen alleges that Defendants' execution customs include limited audio and visual access to certain components of an execution.

Appen asserts three claims under 42 U.S.C. § 1983 attacking Defendants' discretion to control *who* and *what* can be observed during an execution under the procedures and policies detailed above. [Doc. 1, ¶¶ 2, 7]. First, Appen alleges that Defendants' unbridled discretion in regulating protected activity violates the First and Fourteenth Amendments. [*Id.* at ¶¶ 106–116]. Second, relying on the same constitutional amendments, Appen asserts a right-of-access claim, arguing that the media has a constitutional right to view every aspect of an execution, including the parts the media—even the media monitor—currently cannot see. [*Id.* at ¶¶ 117–145]. And third, Appen says that those two amendments give the media a right to receive more information regarding Georgia's execution process than the media witnesses can directly observe. [*Id.* at ¶¶ 146–151]. In short, Appen alleges that the First Amendment "demands that Defendants' restrictions be, at the very least, subject to [judicial review], and that the State [of Georgia] cannot hold unbridled discretion regarding which

components of execution proceedings can be observed and reported on and which cannot." [*Id.* at ¶ 3]. Appen argues that Defendants' unilateral decision-making ability and their restrictions on audio and visual access to critical steps of the proceedings are unconstitutional and should be enjoined unless sufficiently justified. [Doc. 8, p. 12 (citing [Doc. 1, ¶¶ 24–77])].

Georgia's next execution is set for September 16, 2026, making Appen's TRO motion urgent. With the benefit of oral argument from both sides on September 9, 2026, the Court rules as follows. [Doc. 2]; [Doc. 14].

## **LEGAL STANDARD**

The parties in this case are experienced and are fully aware of the four requirements for preliminary injunctive relief in the Eleventh Circuit. *See Long v. Sec'y, Dep't of Corrs.*, 924 F.3d 1171, 1176 (11th Cir. 2019). Regardless, here is a brief overview. "In the Eleventh Circuit, '[a] federal court may grant a temporary restraining order . . . only if the movant establishes'" that there is a substantial likelihood of success on the merits; the restraining order or injunction is necessary to prevent irreparable injury; the threatened injury outweighs the harm that the restraining order or injunction would cause to the non-movant; and the restraining order or injunction would not be averse to the public interest. *Goldstein v. Nat'l Collegiate Athletic Ass'n*, No. 3:25-cv-00027-TES, 2025 WL 581333, at *2 (M.D. Ga. Feb. 20, 2025) (quoting *Long*, 924 F.3d at 1176). "As the movant, [Appen] bears the burden of persuasion as to each of these four prerequisites."

*Goldstein*, 2025 WL 581333, at *2 (quoting *Strickland v. Deutsche Bank Tr. Co. Americas*, No. 5:18-CV-3 (CAR), 2018 WL 715408, at *3 (M.D. Ga. Feb. 5, 2018)). And, the Eleventh Circuit has instructed its district courts to be even more tentative in issuing injunctions when, as here, the party to be enjoined is a state governmental entity. *See McKusick v. City of Melbourne, Fla.*, 96 F.3d 478, 487–88 (11th Cir. 1996) ("[W]hen, as in this case, [equitable remedies] are sought to be applied to officials of one sovereign by the courts of another, they can impair comity, the mutual respect of sovereigns—a legitimate interest even of such constrained sovereigns as the states and the federal government").

**DISCUSSION**

On July 17, 2012, the Commissioner crafted the GDC's procedures, and on July 14, 2022, the Commissioner implemented the current media relations policy that Appen attacks in this suit. [Doc. 1-2, p. 2]; [Doc. 9-1, p. 1]. Here, Appen brings a facial attack on the Commissioner's "structure"—meaning that Appen could have brought suit any time after those dates. [Doc. 1, ¶ 32]. However, Appen did not do so until the Attorney General announced Georgia's next execution on August 27, 2026. Six days after that announcement, Appen filed suit, and as mentioned above, the Court heard the TRO motion on September 9, 2026, in relation to the impending execution set to take place at 7 P.M. on September 16, 2026. [*Id.* at ¶ 17]; [Doc. 14]. Needless to say, the Court and the parties are operating on a much-compressed timeline. Mindful of the impending execution deadline and the need for some meaningful review of the near-certain appeal

of this order, the Court made some critical, but necessary, initial findings.

There are two different standing standards in play in this case—Article III standing, obviously, and standing for Appen's unbridled-discretion claim. Appen argues that it has standing under both because it receives information from the media witnesses who attend the executions *and* are subject to Defendants' policies, even though Appen has never sent a reporter to the GDCP to cover an execution. Appen alleges that it intends to do so in the future. Appen also argues that it "need only establish that it is 'likely' to have standing," not that it definitively has it at this stage. [Doc. 10, p. 5 (quoting *HM Florida-ORL, LLC v. Governor of Fla.*, 23-12160, 2026 WL 2235960, at *3 (11th Cir. Aug. 4, 2026))]; *Murthy v. Missouri*, 603 U.S. 43, 58 (2024). Although the question of standing will certainly need to be fleshed out, specifically whether Appen has suffered "an injury that is concrete, particularized, and imminent rather than 'conjectural or hypothetical," the Court concludes that Appen has standing (based on its unbridled-discretion claim) to bring its emergency motion. *Trump v. California*, 609 U.S. ----, 2026 WL 2473573, at *2–3 (U.S. Aug. 24, 2026).

Second, ripeness. Federal courts may not decide cases "dependent on 'contingent future events that may not occur as anticipated, or indeed may not occur at all.'" *Trump v. New York*, 592 U.S. 125, 131 (2020) (per curiam). As the Court will discuss below, Appen was not selected to serve as a designated media witness to the impending execution. Again, Appen has never been selected. The question of ripeness is necessarily

intertwined with the issue of standing in this case and that question will be answered in time. However, for purposes of the pending motion for an emergency temporary restraining order only, the Court finds the question ripe for adjudication.

The Court now turns to the merits of Appen's TRO motion. Since a TRO requires Appen to establish a substantial likelihood of success on the merits of each of its claims, the Court begins by analyzing the validity of Appen's claims and then concludes with whether Appen meets each element of a TRO.

**A. <u>Appen's Right-of-Access Claim</u>**

Relying on the First and Fourteenth Amendments, Appen asserts a right of access to "all phases of the execution." [Doc. 1, ¶¶ 117–145]. The Supreme Court has recognized a First Amendment right of *public* access to limited types of governmental proceedings, particularly those related to criminal trials. *See Richmond Newspapers v. Virginia*, 448 U.S. 555, 568–70 (1980); *Press-Ent. Co. v. Superior Ct.*, 478 U.S. 1 (1968). To determine whether there is a First Amendment right of access to a governmental proceeding, courts look at whether a right of access played a significant role in the functioning of the judicial process and government as a whole, and whether the proceeding was historically open to the press and the general public. *Globe Newspaper Co. v. Superior Ct. for Norfolk Cnty.*, 457 U.S. 596, 605–06 (1982). In simpler terms, the "logic and experience" test. *Id; Press-Enter.*, 478 U.S. at 8 (quoting *Globe Newspaper*, 457 U.S. at 605).

But, "[t]he Supreme Court has never recognized a First Amendment right of access to executions." *Ark. Times, Inc. v. Norris*, No. 5:07CV00195 SWW, 2008 WL 110853, at *2 (E.D. Ark. Jan. 7, 2008). In 1893, the Georgia General Assembly banned public executions. *See* n.5, *infra*. This 133-year-old ban draws into serious doubt that the general public, not just the press, has enjoyed a historical right to witness executions in Georgia. As such, Defendants argue that the logic-and-experience test is inapplicable to executions, a view shared by some courts. *See, e.g.*, *Okla. Observer v. Patton*, 73 F. Supp. 3d 1318, 1325 (W.D. Okla. 2014) ("In any event, based on these authorities, the court concludes the *Press-Enterprise* exception does not extend to the circumstances existing here, which are outside the criminal adjudication process."); *see also Associated Press v. Neal*, 177 F.4th 862, 865 (7th Cir. 2026) ("We doubt this framework applies to executions."). This Court joins with the others. Absent clear precedent from the Supreme Court or the Eleventh Circuit, the Court declines to apply the logic-and-experience test to executions.

With that said, the parties agreed at the hearing that Georgia's history evidences some kind of First Amendment right for the media to witness executions because, unlike some states, Georgia has allowed the media to observe executions for well over a

century.[5] *See, e.g.*, [Doc. 1-1, pp. 27–28 (news article from 1914 describing execution with county officials, physicians, and reporters in attendance)]. Assuming on the limited record before the Court that the parties are correct and a constitutional right exists for the press to observe executions, that right is not nearly as expansive as Appen claims it to be (which the Court details below in discussing Appen's claim that the media has a right to receive more information about Georgia's executions).

The record thus far does not support that the media enjoys a historical right in Georgia to all parts of an execution, including the preparations or the physical administration of the punishment. Appen has yet to offer anything to show that the media historically observed any the state's preparations for an execution or that the media observed the physical administration of the punishment—including the throwing of the switch for the electric chair or the plunger being applied to a syringe carrying the chemicals that ultimately cause the death of the condemned. If there is any First Amendment right for the media to observe an execution, that right is no more than a baseline, narrow, limited right that allows the media to hear and see the reading of the

---

[5] In 1859, the Georgia legislature began to move away from public executions by giving judges the discretion to make an execution private if they thought it was appropriate, citing the "demoralizing" tendency and "disgraceful" nature of executions. Donald E. Wilkes Jr., *Sentenced to Death*, Popular Media, pp. 3-4, June 30, 1994, https://digitalcommons.law.uga.edu/cgi/viewcontent.cgi?article=1138&context=fac_pm. The Georgia General Assembly then banned public executions in 1893. *Id.* at p. 4. Today, all executions across the country take place in private facilities with only a small number of witnesses. *Associated Press v. Neal*, 177 F.4th 862, 866 (7th Cir. 2026).

execution order, any prayer, final statements, and the death itself.[6]

Without a Supreme Court holding expanding *Press Enterprise* to include executions in the list of proceedings where the media has a constitutional right of access, many courts have nonetheless applied the logic-and-experience test to executions.[7] *See generally Neal*, 177 F.4th 862; *Ark. Times*, 2008 WL 110853, at *4. Here, even if the Court alternatively applied the logic-and-experience test to Appen's emergency motion, the right as Appen frames it does not exist.

As explained earlier, Appen can't show a historical right to observe and hear all aspects of an execution other than the execution itself. For the logic prong, media access to executions plays some role in the functioning of the judicial process and government. Namely, it contributes to informed public discourse, and public accountability, both of which affect voting and other similar government processes. *Cooper v. Dillon*, 403 F.3d 1208, 1214 (11th Cir. 2005) ("But more importantly, these First Amendment freedoms are also understood to be essential to the maintenance of our democratic polity, which depends upon an informed citizenry to hold government officials accountable for error and abuse and to seek redress and change by lawful means."). Without meeting *both* the

[6] During the hearing, Appen tried to point to the intimate details in some articles to show that the press had access to more than the execution. However, details such as, "Meyers' wife visited him in the jail last night and he bade her goodbye" can equally come from a reporter using the media's limited access to interview prison guards and officials. *See, e.g.*, [Doc. 1-1, p. 30].

[7] For example, the Ninth Circuit held that there is a public right of access to executions in California. *Cal. First Amend. Coal. v. Woodford*, 299 F.3d 868, 875 (9th Cir. 2002). More recently, the Seventh Circuit held that there is no public right of access to executions in Indiana. *Neal*, 177 F.4th at 868.

historical and logical prongs, Appen can't meet the *Press-Enterprise* test, assuming it applies. Again, in Georgia, the media's First Amendment right to access executions is limited to the events involving the execution itself: the reading of the execution order, any prayer, final statements, and the death itself. That is what has historically been allowed and what the record at this stage of the case supports. But, even if Appen and the media in general enjoy such broad First Amendment rights as Appen alleges, Defendants have shown compelling reasons why they restrict media access when it comes to the observance of executions. *See Press-Enter. Co.*, 464 U.S. at 510 (openness may be overcome by showing that "closure is essential to preserve higher values and is narrowly tailored to serve that interest.").

According to Defendants, they restrict visual access during the preparation of the execution to comply with the Georgia Secrecy Act, which requires the State to preserve the confidentiality of the persons performing the execution as well as the formulas to the chemicals involved. [Doc. 7, p. 11]. While those involved in an execution are allowed to wear masks to remain anonymous, any recording of their voices via some electronic device "as specifically authorized by the Warden" could be used to identify someone's voice and, in turn, their identity given the prolific availability of the internet and artificial intelligence. [Doc. 1-2, pp. 4–5]; [Doc. 9-1, ¶ 6]. Additionally, Defendants don't allow media in the room behind the execution chamber designated for the injection process because the Attorney General and the Commissioner are both present and often

engage in privileged communications. The Court finds these justifications sufficient.

When it comes to the audio restriction when the attendants insert the intravenous ("IV") line into the prisoner, Defendants contend that such a restriction is needed to preserve the dignity of the prisoner during an invasive medical procedure and to allow the medical personnel to speak freely with the condemned and each other. [Doc. 7, pp. 9–10]. Appen also complains that Defendants arbitrarily limit the visual observance of the IV insertion to just the media monitor (which, as mentioned above, the Commissioner doesn't even directly choose) rather than all five media witnesses. Again, the Court finds the preservation of the dignity of the prisoner during this invasive procedure to be sufficient.

**B. <u>Appen's Claim Related to the Media's Right to Receive Information</u>**

Appen says the First and Fourteenth Amendments give it a right to receive information about Georgia's execution process. [Doc. 1, ¶¶ 146–151]. Indeed, the Supreme Court has recognized that the First Amendment offers some protection to news gathering for journalists. *Branzburg v. Hayes*, 408 U.S. 665, 681 (1972). However, "[t]he First Amendment does not guarantee the press a constitutional right of special access to information not available to the public generally." *Id.* at 684; *see also Pell v. Procunier*, 417 U.S. 817, 834 (1974). In other words, the First Amendment grants the media limited constitutional protections, not superior constitutional privileges. So, when it comes to executions, the media are entitled to receive the information that any

ordinary citizen would receive and nothing more.

During the hearing, Appen clarified the information it believes it has a right to receive: audio access during most stages of execution; observation of the injection room, which Appen suggested could happen via camera; and observation of the preparatory steps leading up to the execution including the transportation of the drugs and the testing of the equipment. Defendants argued at the hearing that granting Appen its desired TRO would closely transform the First Amendment into a Freedom of Information Act. Defendants again rely on the same rationale for their imposed media limitations as they did for the right-of-access claim discussed above. As the Court previously explained, any First Amendment right for the media to observe executions is limited, and the Court adopts that reasoning when it comes to any claim related to a right to receive information. Nothing in the current record convinces the Court that the media enjoys the expanded rights Appen seeks.

**C. <u>Appen's Unbridled Discretion Claim</u>**

Appen alleges that Defendants' unbridled discretion in regulating protected activity violates the First and Fourteenth Amendments. [Doc. 1, ¶¶ 106–116]. The unbridled discretion doctrine "is grounded in the notion that excessive discretion . . . is constitutionally suspect because it creates the opportunity for undetectable censorship and signals a lack of narrow tailoring." *Jarrard v. Sheriff of Polk Cnty.*, 115 F.4th 1306, 1321 (11th Cir. 2024) (quoting *Burk v. Augusta-Richmond Cnty.*, 365 F.3d 1247, 1256 (11th

Cir. 2004)). Instead, government policies must be narrowly drawn, reasonable, and contain definite standards that guide the official decisionmaker's course of action. *Id.* (quoting *Tracy v. Fla. Atl. Univ. Bd. of Trs.*, 980 F.3d 799, 809 (11th Cir. 2020)).

Unlike other constitutional claims where a harm has already occurred, the constitutional injury requirement for unbridled discretion is satisfied if Appen is "subject to the law" that provides the discretion. *Barrett v. Walker Cnty. Sch. Dist.*, 872 F.3d 1209, 1220 (11th Cir. 2017). That way, Appen may challenge the law "without the necessity of first applying for, and being denied, [access to witness parts of an execution]." *Id.* (quoting *City of Lakewood v. Plaint Dealer Publ'g Co.*, 486 U.S. 750, 755–56 (1988)). "In other words, a plaintiff has standing to facially challenge a law that allegedly grants unbridled discretion as long as the plaintiff 'is subject to' or 'imminently will be subject to' that particular law." *Id.* (citing *CAMP Legal Def. Fund, Inc. v. City of Atlanta*, 451 F.3d 1257, 1274 (11th Cir 2006)). Therefore, to show a substantial likelihood of success on the merits, Appen must show that Defendants have a policy that gives them unbridled discretion, and that Appen is subject to, or imminently will be subject to, that policy. The Court starts with whether Appen is subject to the law, since that is an issue of standing.

The Court already stated that Appen has standing at this stage. *See HM Florida-ORL*, 2026 WL 2235960. Briefly, here is the Court's reasoning why. The record at this stage is very limited. Appen argues that it meets the "subject to" requirement because it

"intends to increase" coverage of executions, and "has declared its intention to send a reporter to [the] GDCP during future executions to receive information directly from the designated media representatives."[8] [Doc. 10, p. 6]. During the hearing, Appen stated it might be a representative in the future, but since the GPA, the AP, and the GAB select the media witnesses (not any Defendant), Appen hasn't shown (and can't show) that these media associations will ever choose it to be a media outlet selected to witness an execution. While it appears that Appen has never sent a reporter to the GDCP in the past, it assures the Court that it intends to do so for future executions. [Doc. 1, ¶ 18]. This intent certainly differs from several Eleventh Circuit cases where the parties previously applied or asked permission to conduct regulated activity and/or had concrete intentions to do so in the future. *See, e.g.*, *Barrett*, 872 F.3d at 1220–21 (detailing how the plaintiff in *CAMP* applied for permits in the past and intended to apply in the future, and how Barrett applied in the past and intends to do so in the future) (citing *CAMP*, 451 F.3d at 1274–75). Regardless, for purposes of an emergency TRO only, the Court finds, for now, that Appen's allegations on such a limited record are sufficient to show it's "subject to" the regulations.

Now onto whether Defendants have unbridled discretion in administering the

---

[8] Appen also argued that it is subject to the law giving unbridled discretion because it gathers its news from the five witnesses who are in the room and subject to Defendants' restrictions. However, as discussed below, that is insufficient because Appen may only bring an unbridled discretion claim as to the Commissioner's veto power.

media-relations policy. Under Defendants' current policy, the Commissioner can "decline to allow a media witness to attend an execution or serve as the media monitor in his or her sole discretion *for any reason*." [Doc. 9-1, ¶ 3 (emphasis added)]. But, under this policy, the Court finds it important that the Commissioner has no role whatsoever in selecting the media witnesses. Rather, the Commissioner has outsourced that role to the media itself. The three media associations listed above unilaterally decide who will represent the media at executions, and they do so with no prerequisites, input or limitation from the Commissioner, other than limiting media witnesses to no more than five. So, the "unbridled discretion" that Appen accuses the Commissioner of wielding is essentially a veto power over reporters that the private media companies select.

This type of regulation is far different from the regulations at issue in *Jarrard*. 115 F.4th at 1322. There, Jarrard was a prison minister whose teachings on baptism were not popular with other volunteer ministers or the sheriff. *Id.* at 1312. The jail enacted a policy regarding how volunteer ministers could be approved to enter the jail. *Id.* The jail denied Jarrard access under that policy. *Id.* Jarrard sued, and the jail enacted a second policy, which is more relevant to this case. *Id.* at 1313. Under the second policy, the sheriff filtered clergy applications for the jail administrator to then approve. *Id.* at 1322. Jarrard amended his complaint to include his denial under the second policy, and the prison subsequently enacted a third policy. *Id.* at 1313. Under this policy, the jail itself fielded all applications. *Id.* at 1322.

In this case, media associations serve as an unregulated, private middleman and the Commissioner only comes into play after the named media associations select the media witnesses. And, importantly, Defendants highlight that notwithstanding the unlimited discretion given to the Commissioner in the media relations policy, no Commissioner has ever vetoed a single media witness from serving. Regardless, the Court finds that the media relations policy gives the Commissioner unbridled discretion because it contains no guardrails to guide his decisions, and in the event, he does deny access to a media witness, it does not require him to state his reasons. Under the limited record, Appen has shown a substantial likelihood of success on the merits as to the Commissioner's veto power under paragraph three of the prison's media regulations policy. *See, e.g.*, [Doc. 9-1, ¶ 3].

Appen's argument also claims that Defendants have unbridled discretion over what the media can and cannot see or hear during an execution. Consistent with *what* Georgia's history permits for witnessing executions, no media witness can observe the general preparations, the room behind the execution chamber designated for the injection process, or hear certain communications where Defendants lawfully turn off any audio. There is no policy on the record at this stage that supports or refutes the existence of such discretion. To be sure, Appen points to practices, which Defendants don't deny, but there is no policy per se in the record. Regardless, as the Court has already explained above, the expansive rights Appen claims do not exist in Georgia.

There is simply not enough on the record for the Court to say, at this stage, that policies or law[9] give Defendants unbridled discretion over First Amendment protected activity other than the Commissioner's veto power.

### D. Appen's Request for a Temporary Restraining Order

As a reminder, the Court outlined the elements of a TRO above. Appen bears the burden of persuasion as to all four elements. The Court now, with the benefit of its analysis of Appen's claims, walks through each TRO element in turn.

#### 1. Substantial Likelihood of Success on the Merits

To summarize the Court's discussion above, Appen did not meet its burden to show a substantial likelihood of success on the merits for its right of access claim. If anything, the media enjoys only a limited right to observe executions in Georgia and nothing more. The media certainly does not enjoy the sort of expansive rights Appen claims. So, without more, Appen has not shown a substantial likelihood it will succeed on the merits of its right-of-access claim because it has not shown any deprivation of this limited right: Defendants have not barred the media from viewing executions in general, or the upcoming execution. Accordingly, Appen is not entitled to an emergency TRO for this claim.

Regarding Appen's claim related to the media's right to receive information, the

[9] Appen consistently assured the Court that it was not asking the Court to declare O.C.G.A. § 17-10-41 unconstitutional because it allows the Commissioner to solely determine the witnesses to be present at an execution.

record before the Court does not support a substantial likelihood of success on the merits. Again, Appen has not shown that it is constitutionally entitled to the broad categories of information it seeks or the expansive manner it contends it can observe executions. Assuming Appen does have such rights, Defendants have shown compelling reasons to restrict the information. On this limited record, Appen has not shown a substantial likelihood that it will prevail on the merits for its claim related to a right to receive information. Thus, it's not entitled to an emergency TRO for that claim.[10]

However, when it comes to its unbridled-discretion claim, Appen has shown, under the limited record, a substantial likelihood of success on the merits for part of the claim. As detailed more fully above, the grant of the TRO is strictly limited to the Commissioner's unlimited veto power over designated media witnesses as found in paragraph three of the prison's media policy. *See* [Doc. 9-1, ¶ 3]. Since Appen only established a substantial likelihood of success on the merits for a limited portion of its unbridled discretion claim, that is the only claim for which the Court may potentially grant temporary injunctive relief.

**2. Irreparable Injury**

To obtain temporary injunctive relief, the relief must be necessary to prevent irreparable injury. *Long*, 924 F.3d at 1176. Government polices "that violate the First

[10] Because Appen fails the first requirement of the TRO test on its right-to-access claims and its right-to-receive-information claim, the Court need not analyze the other factors as they apply to these counts.

Amendment are 'per se irreparable injur[ies].'" *LaCroix v. Town of Fort Myers Beach, Fla.*, 38 F.4th 941, 954–55 (11th Cir. 2022). For that reason and many of the reasons discussed above regarding Appen's standing to bring an unbridled discretion claim, the Court finds Appen to have met the irreparable injury requirement at this stage.

**3. Harm to Defendants**

The issuing court must be mindful that its injunction "would not substantially harm the other litigant." *Long*, 924 F.3d at 1176. A narrow injunction to match Appen's remaining, narrow unbridled-discretion claim would not substantially harm Defendants. Requiring the Commissioner to provide a reason should he reverse himself and refuse to allow a designated media witness that he has already approved (based on the GAP, the AP, and the GAB's selection) to observe the execution within its customary limits is not substantial harm. At most, the Commissioner would have to explain his thought process for switching and declining to allow one of the approved media witnesses to observe an execution. Such harm, if harm at all, is not substantial.

**4. Public Interest Considerations**

Fourth and finally, "if issued, the injunction [cannot] be adverse to the public interest." *Long*, 924 F.3d at 1176. To be sure, Georgia has an unequivocal public policy interest in carrying out its legally sanctioned executions. Likewise, Georgia also has a responsibility to ensure its executions are carried out without offending the United States Constitution. A limited injunction, therefore, supports the public interest because

it removes a "constitutionally suspect" policy that "creates the opportunity for undetectable censorship" in favor of transparency. *Burk*, 365 F.3d at 1256. The Court's narrow TRO certainly is not adverse to the public interest. Appen satisfied this element.

### E. **Conclusion**[11]

"The federal courts do not sit to supervise state prisons, the administration of which is acute interest to the States." *Meachum v. Fano*, 427 U.S. 215, 228 (1976), *overruled on other grounds by Sandin v. Conner*, 515 U.S. 472, 483 (1995); *see also Dunn v. Comm'r, Ala. Dep't of Corr.*, 179 F.4th 1277, 1293 (11th Cir. 2026) ("federal courts do not sit as 'super-wardens' over the day-to-day operations of the country's prison systems."). That said, federal courts "may not allow constitutional violations to continue simply because a remedy would involve intrusion into the realm of prison administration." *Dunn*, 179

[11] "[T]he Supreme Court has cautioned lower courts to 'exercise the utmost care whenever [they] are asked to break new ground' in the realm of substantive due process." *Sterling v. City of Jackson*, --- F.4th ----, 2026 WL 2617771, at *1 (5th Cir. Sept. 4, 2026) (citing *Dobbs v. Jackson Women's Health Org.*, 597 U.S. 215, 240 (2022)). District courts should be "reluctant to expand the concept of substantive due process because guideposts for responsible decisionmaking in this unchartered area are scarce and open-ended." *Collins v. City of Harker Heights*, 503 U.S. 115, 125 (1992). Justice Thomas has accurately described the idea of substantive due process as "a jurisprudence devoid of a guiding principle." *McDonald v. City of Chicago*, 561 U.S. 742, 812 (2010) (Thomas, J., concurring). The Court heeds that warning here. To the extent that Appen makes any claim for these expanded media rights under the Substantive Due Process Clause, the Court declines its invitation to construct new constitutional rights on such shaky constitutional ground. *Reno v. Flores*, 507 U.S. 292, 303 (1993) ("The mere novelty of such a claim is reason enough to doubt that 'substantive due process' sustains it.").

For these reasons, the Court finds that Appen has failed to show a substantial likelihood of success on the merits on any claim under the Substantive Due Process Clause. Accordingly, to the extent such relief is sought, the Court **DENIES** Appen's motion for a TRO under the Fourteenth Amendment.

F.4th at 1291 (quoting *Brown v. Plata*, 563 U.S. 493, 511 (2011)). For the reasons stated above, the Court **GRANTS** Appen's Emergency Motion for a Temporary Restraining Order **in part**. [Doc. 2]. The Court **ENJOINS** and **RESTRAINS** the Commissioner of the Georgia Department of Corrections from denying any approved media witness so designated under the GDOC's Media Relations Policy 102.01 access to the upcoming execution. Should the Commissioner ultimately decide to not allow any designated media witness from attending the execution, he must immediately provide his reasoning for doing so to the Court.

Finally, the Court will address Defendants' Motion to Dismiss once the parties have fully briefed it. [Doc. 7]. The parties must file any response and/or reply briefs in accordance with the Court's Local Rules. Should either party appeal this order, the Court **STAYS** this case until the Eleventh Circuit rules on the appeal.

**SO ORDERED**, this 14th day of September, 2026.

*S/ Tilman E. Self, III*
**TILMAN E. SELF, III**
**UNITED STATES DISTRICT JUDGE**